Your Honors, good morning. My name is Luis Carrillo-Pirin on behalf of Appellant Martin Zavala. Just as a quick housekeeping matter, were each of you able to view the video that the clerk in San Francisco asked me to provide to this Honorable Court? I think the video is available. I have not yet reviewed it. Available, yeah. I think we had a tough time getting it out of you, didn't we? The clerk called me and asked me to FedEx it here. And because I was responding to five different motions in the case involving the city of Montana, the clerk called me again and then asked me to have it messengered to Woodland Hills, which I did do. And the clerk called me the same day because the messenger didn't arrive in the morning. He only arrived in the afternoon, even though he got it at 11 a.m. And I apologize for any inconvenience, Your Honor. That's all right. But I would ask each of you to view both videos. One is in normal speed and one is in slow motion because looking at the video, it completely undermines the testimony of various police officers who testified at the trial. In the scene at the trial, they described a very chaotic, dangerous scene where they had to take immediate action to remove the protesters from Pershing Square. And when you look at the video, that testimony is impeached by what is in the video. It's a peaceful day. Protesters are banging their drums in colorful gear, young people. There's even one police officer there viewing the protesters. And it completely impeaches them. And then it zooms in. Doesn't the film show that the bulk of the protesters were told to move on and their backs are to the police officers that have their nightsticks in front of them and your client is facing the police officers? Where it zooms in on my client. Is that on the film? On the film where you see is the first thing you see is the court, the coroner, the officer. The question, is there a piece on the film where your client is facing the police officers where the rest of the crowd has their back to the police officers? Part of that, yes. Because that part is where the camera zooms in. And what you see is my client looking to his back to the north to see what's going on. And the next thing you see is he's being assaulted by police officers. But that film is running continuously. And what you see seconds before are the peaceful protesters which are on the southwest corner of Fifth and Olive. And where the incident took place, took place on the southeast corner of Fifth and Olive. Was this a, I assume this was obviously in the district court. The film was used in the district, was available at least in the district court. Part of the district court record? Well, they took it with them after the district court and you took the film back. Yes, sir, to both. Yes, sir, the jury saw the film. Both sides used the film, the city attorney as well as plaintiff. Is that a news film or was it a private citizen? It was a private citizen amateur film, what it was. Okay, well, I'll look at it before we're finished. I thought you were going to show us the film here today. Well, I had. I mean, did you make some mention of that? Yes, Your Honor, I did request equipment when I submitted my time estimate. However, I didn't see any equipment here. And I never followed up on my inquiry as to whether or not the camera or VCR recorder would be available. And that's why I asked the preliminary question if you had viewed it or not. And I took it when the district court. I was kind of waiting for your showing, you know. But I don't have it, Your Honor. I haven't been to the movies for a long time. This is going to be an opportunity. Yes, sir. Unfortunately, when my messenger delivered it to Woodland Hills. You didn't even follow up to see if the equipment was going to be here today. No, I didn't, Your Honor. And I apologize. I assumed that either because the clerk in San Francisco asked me to take it to Woodland Hills by messenger, I had assumed that either. But we don't have that equipment. I mean, if you're going to show something, you have to bring the equipment. Thank you, Your Honor. All right. But what I wanted to argue for, Your Honor, this is an opportunity for this court de novo to view what the district court did and to reverse the district court. What's your case? What case do you rely on if we review the district court's findings de novo? I relied on the various cases that I cite in the appellant's opening brief, Your Honor. And it's in the standard horn book. So we're free to make fact-finding at the court of appeals, right? Your Honor, if you feel that that is part of the de novo process, yes. Well, that's it. We're reviewing a judgment as a matter of law. He took it away from the jury. He took it away from the jury. Okay. And what he did, Your Honor, unfortunately, is that he did not view the light, the most favorable light to the non-moving party, that is to Mr. Sovala. What he did is he really weighed the law in favor of the city, in favor of the police officers, in favor of the police department. And the district court, when you read the arguments pro and con in favor of the Rule 50 motion propounded by the city, you see that he's really weighing everything in favor of the defendants and really nothing in favor of the appellant. He didn't even draw any reasonable inferences in favor of the non-moving party. He didn't even analyze under Graham v. Connor three factors which I submit were important. That is the severity of the crime at issue, whether the person poses an immediate threat to the safety of officers. Three factors that Graham v. Connor mentions. And the third factor, whether he's actively resisting. They were worried about a car bomb, right? Wasn't that part of it? Yeah. And they wanted to clear the place so people wouldn't get hurt. That's what Sergeant McNamara testified to. There was a car out there. Not when you see the video. That's where I point out in my report. The whole thing's just made up, huh? No. I don't know if that thing was made up. I submit that I believe it was made up, but I don't know if it was made up or not. Because when you see the video, and even Sergeant Lewis admitted under cross-examination that when he took his squad up there, there was no bomb squad there and there was no car parked in the middle of the street or in the intersection. And when the video is rolling, you see no bomb squad vehicles and you see no vehicle that is in the intersection. You see no waiting pool. You see nothing that Sergeant McNamara testified to at the trial. So if I'm incorrect and they didn't make that up, then that may have happened an hour earlier or half an hour earlier. I don't know. But certainly in the minutes and seconds before Mr. Zavala was assaulted by the police, there was no bomb squad, no car in the intersection. And the video clearly shows that. And so I submit, and I did it in my reply brief, that that scenario really was not unfolding in the seconds and minutes before the incident with Mr. Zavala. There was no bomb threat at that instance. And that's where the video picks up, where there's people moving south and Mr. Zavala turns to his right. And then he's assaulted. And one thing that the district court should have done, it should have looked at all the reasonable inferences in favor of Mr. Zavala. And I submit it never did. It routinely granted the rule. It just seems like the court has made up its mind. When was he assaulted? Was the club picked up and brought down on him? Sergeant Lewis thrust once with his baton. How did he hold the baton? One hand or two. It was a forward thrust, I believe. One hand or two. I don't remember right now, Your Honor, if it was one hand or two, but it was a forward thrust with the baton. Now, the video in slow motion, the second one that you will see. You know, if you're holding it like this, you're trying to get people back. And if you're holding it and you're pointing it towards a person and you thrust that way. Carrillo, the second officer, did thrust it in a forward position. And that's clearly what you see in the slow motion version of it. In slow motion, it shows Mr. Zavala merely standing there. And then Carrillo rushes up three or four or five feet and thrusts and whacks him and pushes him back to a little little foyer. But he did thrust Mr. Zavala once, Sergeant Lewis. And then Carrillo followed up. And then there was another officer who hit him with another baton. So at that time, there was no severity of crime. There was no before he was hit. There was no felony that was being committed by Mr. Zavala. He was not posing an immediate threat to the safety of officers. And certainly when he merely turns around to look at the police officers at that time, he's not actively resisting or anything before he's hit with the police batons. And the reason that I believe that the scenario created by Sergeant McNamara is totally false or partially false is because I thought, I think that at the time that they were justifying clearing the park, Pershing Square Park area of protesters, was used as a method of justifying why they were clearing out all these youthful protesters. Later on, I believe it became handy to use it in Sergeant Lewis's defense when the civil suit was filed against Sergeant Lewis. And I said and I submit that that was standard operating procedure within the Los Angeles police. We have your argument. Well, and I had one question. I think the I believe I read either in the government's brief or somewhere that he wasn't injured. Is that correct? No, that's the argument that the district court was using. The district court characterized the thrust by Sergeant Lewis as a touching, a mere touching. But he was injured, Your Honor. OK, that's the hospital. He was taken into custody that same evening. They take him to the hospital. I don't know, Your Honor. I didn't make bandages. Did he get any stitches? Did he get any medical examination? I don't know because I didn't represent him in the criminal case. And subsequent to that, my concern was making the case to pass beyond the qualified immunity stage, because that's that's what we always have to fear in these cases. Qualified immunity, because in effect, it gives the police officers. It gives them an extra inning, if you will. In these kind of cases, you know, it's tough enough to convince jurors that police officers did violate someone's civil rights. And when you have the element of a judge granting the Rule 50 motion, it's as if two baseball teams are playing and the baseball team of the civil rights plaintiffs, when it's their turn to bat, they have to run an extra base and an extra 30 or 40 yards to make a home run. And so these kind of cases, Your Honor, are extremely difficult. And when the judges rule in favor of police officers and give qualified immunity, it sends a message to the community that there is not equal justice under the law, that police officers get an extra bite. And that's a significant concern among many, many members in the Latino and African-American community, that the police can get away with about anything. And so that's why I'm asking. Is it your argument that every person on the street that's asked to move on or to get out of the way or to clear an area responds to the police command with no problems? Is that the argument you're making? I don't understand your question, Your Honor. Are there some people who claim civil rights but obstruct police conduct at a scene where told to move on? Of course, I believe that that happens on occasion. It goes both ways, doesn't it? But that didn't happen in this case, and that's the fundamental difference. As a matter of common knowledge, it goes both ways, doesn't it? Oh, certainly. Okay. And you have a finding that just supported the argument you made? Which finding? It's your conclusion based on this record that the police overstepped, right? Of course. Okay. And it's the police's argument, we'll hear it, that they didn't, right? Of course. And the trial judge heard the evidence and decided the case, right? Of course. But, Your Honor, this is where I think there's a difference between justices of the Ninth Circuit and district court judges. I believe you're more sophisticated than to be swayed by all the police officers who came into Judge Trevisan's courtroom in blue testifying as to how the police behaved properly that day. That had an effect on Judge Trevisan, of course. So he sees blue after blue testifying that nothing happened to Mr. Zavala, that he was obstructing the performance of Sergeant Lewis and his squad. So that's why he waited totally in favor of the defendants. Do you think the police intimidated Judge Trevisan? No, sir. I'm not saying that. But there's an element here. It's to me, it's very basic and logical. When you have people in blue coming into a courtroom, that affects not only the jurors, but the trial judges as well. It's it becomes a matter where the judges want to stand with the community as represented by the people in blue. And an isolated instance in their mind where allegedly nobody was injured, then that is probably the person's fault. And that's what the judge did in this case. He said this is basically he said, it's your fault, Mr. Zavala. I'm going to give qualified immunity to this officer. And anything that happened was a result of your actions or inactions. And when you look at the video, you're going to see that the picture that they described happening wasn't there. And I went into it in detail, this elaborate Rodney King scenario where they claim that the video starts rolling after the third attempt by my client to grab a police baton. That is the whole meat and potatoes of Sergeant Lewis's testimony in the city's position, that the video starts rolling when he when he grabs it the third time after he's been knocked down and gets up and comes after the baton again. And the reason I said in my reply brief that that was false and absurd is because Sergeant Lewis was flanked by numerous police officers. If Mr. Zavala had actually tried to grab his baton either once or twice before Sergeant Lewis thrust at him and before Officer Carrillo thrust at him, he would have been on the ground as quick as this and he would have been beaten more severely. So that is where I talk about the officer code of silence at work in this case, in my reply brief. And that is where, Your Honor, I discount totally Sergeant McNamara's testimony as an effort to at the time justify the suppression of First Amendment rights and as a subsequent effort to defeat a civil rights lawsuit. And one of the things that I notice in the city attorney's brief is that there was a smiling Mr. Zavala after the incident. I read it somewhere. And at the time of this incident, Mr. Zavala was receiving medication for his mental illness, for his depression. He was receiving Paxil. In hindsight now, I see where I should have brought a psychiatrist to testify as to the effects of Paxil. It's a tranquilizer. It's not a drug that speeds you up. Anything that Mr. Zavala did well under the influence of Paxil would have been to mellow him out. Why are we getting kind of outside the record? You want to save a little time? Well, actually, Your Honor, it's not outside the record. It's in the record. And I can point to pages if you wish. That's all right. I believe you. Do you have any other questions as to my initial arguments? Thank you, Your Honor. Thank you. Good morning, Your Honor. What I was referring to was you said I should have brought a psychiatrist, you know. Well, you didn't bring a psychiatrist. Yeah, that's what I meant. Good morning, Your Honors. Amy Field on behalf of the city of Los Angeles, Bernard Parks, and Eugene Lewis. I'm not sure how helpful the videotape is going to be. It's very, very short. It is a very amateur videotape. You have to watch seconds of, you know, close-up shots of cars driving by. Do you have a copy of that videotape? Yes, we do. How come we couldn't get it from your office? I believe that when the clerk telephoned. You could have gotten it, Your Honor. When the clerk telephoned me and I asked if it was pursuant to Mr. Carrillo's request to have video equipment in the courtroom, he said, oh, I didn't know that it was Mr. Carrillo who had requested that the tape be sent up. Never mind. I'll call him up right now. That was the conversation we had. Well, Mr. Carrillo didn't request anything. He sent a letter requesting that he have video equipment in the courtroom today. It was the clerk that requested a copy of it so that we could look at it. But I met Stonewall at your office. And then Mr. Carrillo, it took a while to get him to get his attention. So it was a mess, that's all. Well, I apologize to the Court. But I'm representing that my conversation with the clerk was, never mind. So I made no efforts to get it to the court. I was told, never mind. Told what? Never mind. Don't worry about getting the videotape to the court. I'm going to call Mr. Carrillo. That's what I was told by the clerk. You wore the clerk out.  I'll accept your representation. Let's get to the argument. Thank you. What I was going to say was, the videotape is not extremely helpful. But it is helpful in the sense that there is a somewhat clear shot of Mr. Zavala interacting with the officers while the rest of the protesters are, I don't know, by my estimate, maybe a good 12 to 15 feet in front of them moving forward. It is the government's position that events occurred before the tape began, I gather. That's correct, Your Honor. That there was contact and interaction between them. That's correct. The opening section of the tape is focused on one corner where you can see some young girls dancing and hear some drum beating. And then it seems to kind of pan across the street with cars kind of intercepting the line of vision to this police interaction. And it's the testimony of, was it Sergeant Lewis' testimony that the tape cuts in after there's been some? That's correct. Sergeant Lewis' testimony was that he had used his baton in an answer to the Court's question. It wasn't in a jabbing motion. They call it a port-arms position, and it's held like this across their body and used to push forward. And he had done this two times. Mr. Zavala said no. He only contacted me once. And the video picks up on the third thrust with the baton. That's according to his testimony, right? That's according to his testimony. And that is reflected in the videotape, this third and final thrust. It's supported by Mr. Zavala's testimony as well. And I also wanted to point out I'm a bit puzzled by why Mr. Carrillo is talking about Officer Carrillo's conduct that day, because I did want to make clear to the committee that Mr. Carrillo and I think it was Martinez were dismissed before trial for failure to prosecute under Rule 4M, and they were never refiled. The only conceivable claim that could have been alive against the city on a vicarious liability theory would have been the state law battery claim, but Mr. Carrillo did not raise that in his opening brief at all. His opening brief on the state law battery claim was exclusively focused on the conduct of Sergeant Eugene Lewis. So really all this case comes down to, it was that one thrust with the baton by Sergeant Lewis into Mr. Zavala's chest sufficient to make out a Fourth Amendment claim. And as this was the first two thrusts, which aren't on the videotape, is that correct? That's correct. But Mr. Zavala says they never happened. Oh, I see. Okay. I see. His view is that the videotape shows the whole encounter between him and Lewis, or at least the whole beginning of the encounter. That's correct. All right. And all you see is one contact. So either way, we're talking about three baton thrusts or one. And as this Court knows, it's a balancing test. You have to balance the government interest at stake against the degree of force used. And here the degree of force was very, very minimal. This man wasn't even injured as a result of this baton thrust to his chest. And whether he was taking PASOL or not, you can view the video yourself. This did not look like an injured person that was being led away by the police once he was finally taken into custody. He's smiling. He's grinning at the crowd. You know, they're kind of cheering him on. And he doesn't look injured. And he presented absolutely no evidence of injury at trial. And so that has to be balanced against the government interest at stake. This was a Friday afternoon in downtown L.A. in the financial district. They had a crowd of 200 demonstrators and a bomb threat. There was a high degree of urgency for the police to act as they did. And when that's balanced against the minimal force they used against Mr. Zavala, I think as a matter of law, there absolutely was no Fourth Amendment violation. This is Saussure v. Katz. It's so close factually. And I know Saussure was decided on the second prong of the qualified immunity analysis, but the court said that was the only issue before it and also made the comment that had it had the first inquiry, was there a constitutional violation before it, they would have been hard-pressed to find one was made out in this case. So I would argue to this Court that the district court properly granted the Rule 50 motion and its decision to be affirmed on appeal. All right. Thank you. Thank you. Well, you have 1 minute and 23 seconds. Yes. Thank you very much, Your Honor. I think counsel, in good faith, is mistaken that when she talks about the clear shot of Zavala interacting and that the crowd is 12 to 15 feet in front of Mr. Zavala, the beginning of the crowd is 12 to 15 feet in front of Mr. Zavala, but the tail end of the crowd is right next to Mr. Zavala. And you'll see that clearly in the normal speed and also in the slow motion. But also the first part of the amateur video, the first five to six minutes, is about the protest itself. And then it's at that part where she mentions that the women were dancing and the drums were beating and there's a close-up of a police officer. Then it zooms into the action which occurred with Mr. Zavala. And Mr. Zavala testified that he remembers one thrust from Sergeant Lewis. And Sergeant Lewis testified he gave him two thrusts. But the balancing that she calls for under Saucier v. Katz is what the court, in my opinion, didn't do because the court merely looked at the part of Mr. Zavala's side and didn't even discuss the three factors which are important, in my opinion, under Graham v. Conner. What is the person doing at the time? What crime is he allegedly committing? How much of a threat is he to officers? And is he actively resisting? And when you look at those three factors, you can see that Mr. Zavala didn't deserve what happened to him and was not justified. And I ask you not to give a blank check to Judge Trevisan. I ask you to do that because there has to be justice for the people in this community, particularly poor people, particularly minority people. Everyone must feel that they have a stake in the system, a stake in the administration of justice. And when judges routinely grant motions in favor of police, it fosters a perception in many communities that there is no equal justice. The poor judges are routinely granting judgments in favor of the police. It's happened in the district court. It goes both ways. Well, Your Honor, when you face judges that I have and you get judgments against you, either in the summary judgment or under Rule 50, then I can say that too. I mean, you have that problem. Exactly. I have that problem. You have that problem. All right. And so we want to give people a stake in the society and a stake in the administration of criminal justice and civil justice. And we want them to feel that their rights can get vindicated. And when Judge Trevisan didn't vindicate Mr. Zavala's constitutional rights... Let me tell you something that makes you feel better. We take an oath to do equal right to the poor and the rich. Did you know that? Yes, sir. You didn't know that before? I knew that before. And I knew that you're more sophisticated than district judges who perhaps are swayed by the passion of... I don't know. I was a district judge and I had more sophistication then than I have now. Anyway, listen, enjoy your presentation. Good job. Time's up. Thank you, sir. We'll give you more time, too. I appreciate that. Thank you very much. That time is given to you by the city attorney's office. Thank you, Your Honor. Thank you, Counsel. We're going to take a brief recess. I'll allow you to present your search warrant for five minutes. We'll give him five minutes, then. I have it over here. Oh, I see.
judges: Pregerson, Canby, Beezer